Sam Johnson
JOHNSON & MONTELEONE, L.L.P.
350 North Ninth Street, Suite 500
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
sam@treasurevalleylawyers.com
Idaho State Bar No. 4777

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| RONALD GRUNIG and SHANNON GRUNIG, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON, a New Jersey corporation, and ETHICON, INC., a New Jersey corporation,<br><br>Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

### COMPLAINT

COME NOW Plaintiffs, Ronald Grunig and Shannon Grunig, by and through their attorney of record, Sam Johnson of the law firm of Johnson & Monteleone, LLP, and for causes of action against Defendants, hereby Complain and Allege as follows:

### PARTIES

1. At all times herein mentioned, Plaintiffs Ronald and Shannon Grunig, husband and wife, were and are citizens and residents of the state of Idaho, and of the United States.

COMPLAINT AND DEMAND FOR JURY TRIAL - 1

2. Defendant Johnson & Johnson was and is a New Jersey corporation doing business in the state of Idaho, with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

3. Defendant Johnson & Johnson organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its products, including but not limited to its hernia repair mesh products. Within Defendant Johnson & Johnson there exist three sectors: (1) medical devices and diagnostics, (2) pharmaceutical, (3) and consumer. Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise." The Ethicon Franchise was charged by Defendant Johnson & Johnson with the design, development, promotion, marketing, testing, training, distribution and sale of the hernia mesh repair products at issue in this case. The companies comprising the Ethicon Franchise thus remain under the control of Defendant Johnson & Johnson and include, but are not limited to, Ethicon, Inc.

4. Defendant Ethicon, Inc., was and is a wholly owned subsidiary of Defendant Johnson & Johnson. Defendant Ethicon, Inc., was and is a New Jersey corporation, with its principle place of business located in Somerville, New Jersey. Defendant Ethicon, Inc., transacts business in the state of Idaho.

5. Defendant Ethicon, Inc., is a medical device company engaged in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices, including the Proceed Surgical Mesh involved in this action.

6. Defendant Johnson & Johnson, directly and/or through the actions of Defendant Ethicon, Inc., has at all pertinent times been responsible for the research, development, testing, manufacture, production, marketing, promotion, distribution and/or sale of Proceed labeled

products.

7. Defendants are individually, jointly and severally liable to Plaintiffs for damages suffered by Plaintiffs arising from the Defendants' design, manufacture, marketing, labeling, sale and placements of its defective mesh products at issue in the instant action, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

8. Defendants are vicariously liable for the acts and/or omissions of its employees and/or agents who were at all relevant times hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), based upon complete diversity of citizenship between Plaintiffs and all Defendants. The amount in controversy well exceeds the sum of $75,000.00.[1]

10. This Court has personal jurisdiction over each of the Defendants pursuant to the Idaho Long-Arm Statute, Idaho Code § 5-514. Defendants transact business within the state of Idaho, contracted to sell and supply their Proceed products in the state of Idaho, and committed tortious acts and omissions in Idaho. Defendants' tortious acts and omissions caused injury to Plaintiffs in the state of Idaho. Based upon information and belief, Defendants employ sales representatives in the state of Idaho to sell their Proceed products throughout the state, including the Proceed product implanted in Plaintiff Ronald Grunig. Defendants have purposefully engaged in the business of developing, manufacturing, publishing information, marketing, distributing, promoting and/or selling, either directly or indirectly, through third parties, as successor in interest,

---

[1] The medical expenses portion of the claim, alone, exceed the sum of $80,000.00.

COMPLAINT AND DEMAND FOR JURY TRIAL - 3

or other related entities, medical devices including Proceed products in Idaho, for which they derived significant and regular income. The Defendants intended and reasonably expected that their defective mesh products, including Proceed, would be sold and used in Idaho, and could cause injury in Idaho.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS COMMON TO ALL COUNTS

12. In October 2010, Plaintiff Ronald Grunig reported to Mercy Medical Center in Nampa, Idaho to undergo a ventral hernia repair. On October 14, 2010, according to the "Operative Report", Dr. Richard Ballantyne, D.O., performed a "laparoscopic assisted ventral incisional hernia repair with PROCEED mesh." The Ethicon PROCEED Surgical Mesh as identified by the Operative Report and the "Product Traceability Label" was a PCDH1 Model, 20 x 25 cm, surgical mesh, bearing LOT No. BKG507, with a use or expiration date of September 2011.

13. Defendants manufactured, sold, and/or distributed the Proceed device to Plaintiff, through his medical providers, to be used for treatment during the aforementioned hernia repair.

14. After several days of worsening symptoms, including nausea, vomiting, pain and discomfort, and abdominal distension, Plaintiff reported to the Emergency Room at Saint Alphonsus Medical Center – Nampa, on July 16, 2017. Plaintiff was diagnosed with a bowel obstruction and admitted into the hospital.

15. Roughly one week later, on or about July 24, 2017, Plaintiff was taken to the Operative Suite of the hospital where Dr. Forrest Fredline, D.O., performed an exploratory "laparotomy with lysis of adhesions." It is noted in the operative report that at "the time of surgery, there was noted to be dense inflammatory attachment between a distal loop of the small bowel and

the anterior abdominal wall mesh." When describing the procedure, the surgeon stated how the "bowel was slowly dissected off of the underlying mesh" and describes the "removal of a portion of the mesh . . . ."

16. Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of Proceed, including the provisions of warnings and instructions concerning the product.

17. Among the intended purposes for which Defendants designed, manufactured and sold Proceed was use by surgeons for hernia repair surgeries, the purpose for which the Proceed was implanted in Plaintiff Ronald Grunig.

18. Defendants represented to Plaintiff and Plaintiff's physicians that Proceed was a safe and effective product for hernia repair.

19. Defendants' Proceed was defectively designed and/or manufactured, was not reasonably safe for its intended use in hernia repair, and the risks of the design outweighed any potential benefits associated with the design. As a result of the defective design and/or manufacture of the Proceed, there was an unreasonable risk of severe adverse reactions to the mesh or mesh components including: chronic pain; recurrence of hernia; foreign body response; rejection; infection; inadequate or failure of incorporation/ingrowth; migration; scarification; deformation of mesh; improper wound healing; excessive and chronic inflammation; adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tissue damage and/or death; and other complications.

20. Proceed has a unique design incorporating a layer of oxidized regenerated cellulose (ORC) over a layer of polydioxanone, which in turn coats a polypropylene mesh. Based upon information and belief, this design is not used in any other hernia repair product sold in the United

States. The multi-layer coating was represented and promoted by the Defendants to prevent or minimize adhesion and inflammation and to facilitate incorporation of the mesh into the body, but it did not. Instead, the multi-layer coating prevented adequate incorporation of the mesh into the body and caused or contributed to an intense inflammatory and chronic foreign body response resulting in an adverse tissue reaction including damage to surrounding tissue in the form of sclerotic, granulomatous and/or fibrotic tissue and improper healing.

21. The ORC layer of the Proceed has a tendency to delaminate from the other layers of the mesh, resulting in an air pocket, which leads to the formation of a seroma as the body fills the air pocket with fluid. Seroma formation increases the risk of infection, abscess formation and other complications.

22. When affixed to the body's tissue, the impermeable multi-layer coating of the Proceed prevents fluid escape, which leads to seroma formation, and which in turn can cause infection, abscess formation and other complications.

23. The multi-layer coating provides a breeding ground for bacteria in which the bacteria cannot be eliminated by the body's immune response, which allows infection to proliferate.

24. The multi-layer coating of Defendants' Proceed is cytotoxic, immunogenic, and not biocompatible, which causes or contributes to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

25. Defendants knew or should have known of the cytotoxic and immunogenic properties of the multi-layer coating of the Proceed prior to introducing it into the stream of commerce.

26. When the multi-layer coating of the Proceed is disrupted, delaminates, and/or

degrades, the "naked" polypropylene mesh is exposed to the adjoining tissue and viscera, and can become adhered to organs, cause damage to organs, and potentiate fistula formation.

27. These manufacturing and design defects associated with the Proceed were directly and proximately related to the injuries suffered by Plaintiff Ronald Grunig.

28. Neither Plaintiff Ronald Grunig nor his implanting physician were adequately warned or informed by Defendants of the defective and dangerous nature of Proceed. Moreover, neither Plaintiff Ronald Grunig nor his implanting physician were adequately warned or informed by Defendants of the risks associated with the Proceed or the frequency, severity, or duration of such risks.

29. The Proceed implanted in Plaintiff Ronald Grunig failed to reasonably perform as intended. The mesh caused serious injury and had to be surgically removed via invasive surgery to repair the hernia that the Proceed was initially implanted to treat.

30. Plaintiff Ronald Grunig's severe adverse reaction, and the necessity for surgical removal of the Proceed, directly and proximately resulted from the defective and dangerous condition of the product and Defendants' defective and inadequate warnings about the risks associated with the product, and the frequency, severity and duration of such risks. Plaintiff has suffered, and will continue to suffer, both physical injury and pain and mental anguish, permanent and severe scarring and disfigurement, and has incurred substantial medical bills already exceeding the sum of **$80,000.00**, and other expenses, resulting from the defective and dangerous condition of the product and from Defendants' defective and inadequate warnings about the risks associated with the product.

**COUNT I**
**Strict Product Liability: Defective Manufacture**

31. Plaintiffs incorporate herein by reference the allegations in all prior paragraphs as if fully set forth herein

32. Defendants expected and intended the Proceed product to reach users such as Plaintiff Ronald Grunig in the condition in which the product was sold.

33. The implantation of Proceed in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when it designed, manufactured and sold the product.

34. At the time the Proceed that was implanted in Plaintiff s body, the product was defectively manufactured.

35. Defendants' manufacturing and quality control/assurance non-compliance resulted in the non-conformance of the Proceed implanted in Plaintiff Ronald Grunig with intended manufacturing and design specifications.

36. The multi-layer coating of the Proceed also failed to conform to the Defendants' specifications in terms of shelf-life, thickness, durability, and quality.

37. Upon information and belief, Defendants' utilized adulterated polypropylene to manufacture Proceed.

38. Upon information and belief, Defendants' utilized adulterated cellulose to manufacture the Proceed.

39. As a direct and proximate result of the defective manufacture of the Proceed, Plaintiff suffered injuries and damages as summarized herein.

## COUNT II
### Strict Product Liability: Defective Design

40. Plaintiffs incorporate herein by reference the allegations in all prior paragraphs as if fully set forth herein.

41. At the time the Proceed that was implanted in Plaintiff Ronald Grunig's body, the product was defectively designed. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

42. Defendants expected and intended the Proceed product to reach users such as Plaintiff in the condition in which the product was sold.

43. The implantation of Proceed in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when it designed, manufactured and sold the product.

44. The risks of the Proceed significantly outweigh any benefits that Defendants contend could be associated with the product. The multi-layer coating prevents tissue from incorporating into the mesh, leading to encapsulation, deformation, scarification and contraction, migration, erosion and rejection. The impermeable multi-layer coating leads to seroma formation, and provides a breeding ground for infection, and protects bacteria from being eliminated by the body's natural immune response.

45. The multi-layer coating of the Proceed, which was marketed, promoted and intended as a barrier against adhesion to the internal organs, was only temporary; it was expected and intended to degrade over time inside the body. Thus, this coating prevented tissue ingrowth in the short term, and degraded in the long-term, eventually leaving the "naked" polypropylene mesh exposed to the internal viscera and tissues. The degradation of this multi-layer coating caused or exacerbated an intense inflammatory and foreign body reaction. Once exposed to the viscera, the polypropylene mesh will inevitably adhere to the viscera, initiating a cascade of

adverse consequences. Any purported beneficial purpose of the multi-layer coating (to prevent adhesion to the internal viscera and organs) was non-existent; the product provided no benefit while substantially increasing the risks to the patient.

46. The polypropylene mesh within the defective multi-layer coating of the Proceed was in itself dangerous and defective, particularly when used in the manner intended by Defendants. When implanted adjacent to the intestines and other internal organs, as Defendants intended for Proceed, polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

47. Proceed is sterilized with gamma irradiation, which oxidizes the cellulose, creating oxidized regenerated cellulose (OP""C). Cellulose is not bioresorbable in humans until it has undergone oxidation. The complex oxidation process often results in non-homogenous materials, parts of which are unable to be bioresorbed.

48. Based upon information and belief, Proceed is the only polypropylene hernia mesh currently on the market to utilize gamma irradiation for sterilization of the entire hernia mesh. Gamma irradiation causes polypropylene to significantly degrade, and the degradation continues for a long time after the actual sterilization event. Gamma irradiation induced polypropylene degradation result in severe embrittlement of the polypropylene.

49. The ORC layer of Proceed is compromised in the presence of blood or where there is prolonged fibrin deposition due to inflammation. Fibrin is able to readily penetrate ORC and gain access to the base polypropylene. It is this fibrin bridging which initiates adhesion formation. The polypropylene component of Proceed incites a chronic inflammatory response, leading to prolonged fibrin deposition.

50. The appropriate treatment for complications associated with Proceed involves additional invasive surgery to remove the mesh from the body, thus eliminating any purported benefit that the mesh was intended to provide to the patient.

51. Proceed was designed and intended for intraperitoneal implantation, which involved the product being implanted in contact with the intestines and/or other internal organs, which unnecessarily increased the risks of adhesion, erosion, fistula formation, and other injuries.

52. At the time the Proceed was implanted in Plaintiff, there were safer feasible alternative designs for hernia mesh products that would have prevented the injuries he suffered.

53. The Proceed product cost significantly more than competitive products because of its unique multi-layer coating, even though the multi-layer coating provided no benefit to consumers, and increased the risks to patients implanted with these devices.

54. The Proceed implanted in Plaintiff failed to reasonably perform as intended, and had to be partially surgically removed necessitating further invasive surgery to repair the very issue that the product was intended to repair, and thus provided no benefit to him.

55. As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Plaintiff suffered injuries and damages as summarized herein.

## COUNT III
### Strict Product Liability: Failure to Warn

56. Plaintiffs incorporate herein by reference the allegations in all prior paragraphs as if fully set forth herein.

57. At the time the Proceed that was implanted in Plaintiff's body, the warnings and instructions provided by Defendants for the Proceed were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design and/or manufacture

against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

58. Defendants expected and intended the Proceed product to reach users such as Plaintiff in the condition in which the product was sold.

59. Plaintiff and his physicians were unaware of the defects and dangers of Proceed, and were unaware of the frequency, severity and duration of the defects and risks associated with the Proceed.

60. The Defendants' instructions for use provided with the Proceed expressly understates and misstates the risks known to be associated specifically with the Proceed. Based upon information and belief, no other surgical mesh sold in the United States - and no other "surgically implantable material" - suffers the same serious design flaws as Proceed. No other device or material contains the dangerous and defective multi-layer coating, which itself causes or increases the risks of numerous complications, including prevention of incorporation, increased risk of seroma formation, immunologic response, increased risk for infection, and increased inflammatory reaction and foreign body response. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of the Proceed.

61. The Defendants' Instructions for Use for the Proceed failed to adequately warn Plaintiff's physicians of numerous risks which Defendants knew or should have known were associated with the Proceed, including the risks of the product's inhibition of tissue incorporation, pain, immunologic response, dehiscence, encapsulation, rejection, migration, scarification, shrinkage/contraction, adhesion to internal organs and viscera, erosion through adjacent tissue and viscera, bowel obstruction, failure of repair/hernia recurrence, or hernia incarceration or strangulation.

62. Defendants failed to adequately train or warn Plaintiff or his physicians about the necessity for invasive surgical intervention in the event of complications, or how to properly treat such complications when they occurred.

63. Defendants failed to adequately warn Plaintiff or his physicians that the necessary surgical removal of the Proceed in the event of complications would leave the hernia unrepaired, and would necessitate further medical treatment to attempt to repair the same hernia that the failed Proceed was intended to treat.

64. Defendants represented to physicians, including Plaintiff's physician, that the multi-layer coating would prevent or reduce adhesion, and expressly intended for the Proceed to be implanted in contact with the intestines and internal organs and marketed and promoted the product for said purpose. Defendants failed to warn physicians that the multi-layer coating prevented tissue ingrowth, which is the desired biologic response to an implantable mesh device. Defendants failed to warn physicians that the multi-layer coating was only temporary and therefore at best would provide only a temporary adhesion barrier, and when the coating inevitably degraded, the exposed polypropylene would become adhered to the organs or tissue.

65. With respect to the complications that were listed in the Defendants' warnings, Defendants provided no information or warning regarding the frequency, severity and duration of those complications, even though the complications associated with Proceed were more frequent, more severe and lasted longer than those with safer feasible alternative hernia repair treatments.

66. If Plaintiff and/or his physicians had been properly warned of the defects and dangers of Proceed, and of the frequency, severity and duration of the risks associated with the Proceed, Plaintiff would not have consented to allow the Proceed to be implanted in his body, and Plaintiff physicians would not have implanted the Proceed in Plaintiff.

67. As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized herein.

## COUNT IV
### Negligence

68. Plaintiffs incorporate herein by reference the allegations in all prior paragraphs as if fully set forth herein.

69. Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for Proceed, but failed to do so.

70. Defendants knew, or in the exercise of reasonable care should have known, that Proceed was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom Proceed was implanted. Defendants knew or should have known that Plaintiff and Plaintiff's physicians were unaware of the dangers and defects inherent in the Proceed.

71. As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for Proceed, Plaintiffs suffered injuries and damages as summarized herein.

## COUNT V
### Loss of Consortium

72. Plaintiffs incorporate herein by reference the allegations in all prior paragraphs as if fully set forth herein.

73. As a direct and proximate result of the above-described injuries sustained by Plaintiff, his wife, Plaintiff Shannon Grunig, has suffered a loss of her husband's consortium,

companionship, society, affection, services and support.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as a result of the acts and omissions and conduct of Defendants set forth herein. Plaintiff Ronald Grunig is entitled to recover for his personal injuries; past, present, and future medical and related expenses; and past, present and future mental and physical pain and suffering; and Plaintiff Shannon Grunig is entitled to recover for her loss of consortium and services; and Plaintiffs should be awarded punitive damages.

Plaintiffs demand trial by jury, judgment against Defendants, jointly and severally, for compensatory and punitive damages as well as costs, attorney fees, interest, or any other relief, monetary or equitable, to which they are entitled.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

DATED: This 7 day of March, 2018.

JOHNSON & MONTELEONE, L.L.P.

_____
Sam Johnson
Attorney to Plaintiffs

COMPLAINT AND DEMAND FOR JURY TRIAL - 15